MELISSA FIELEKE,                  )
       Plaintiff,                )
                         )
       v.                        )     CAUSE NO.: 4:13-CV-91-PRC
                         )
CAROLYN W. COLVIN,                )
Acting Commissioner of the        )
Social Security Administration,   )
       Defendant.                )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Melissa Fieleke on December 20, 2013, and a Memorandum in Support of Disability [DE 18], filed by Plaintiff on May 12, 2014. Plaintiff requests that the August 31, 2012 decision of the Administrative Law Judge denying her claim for disability insurance benefits and supplemental security income be reversed and remanded for further proceedings. On August 13, 2014, the Commissioner filed a response, and Plaintiff filed a reply on August 27, 2014. For the following reasons, the Court denies Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff suffers from lower back pain, left buttock pain, left hip pain, and left leg pain. On October 1, 2010, Plaintiff filed an application for disability insurance benefits and supplemental security income, alleging an onset date of December 28, 2009. The application was denied initially on December 22, 2010, and upon reconsideration on June 16, 2011. Plaintiff timely requested a hearing, which was held on August 9, 2012, before Administrative Law Judge ("ALJ") William E. Sampson. In appearance were Plaintiff, her attorney, and a vocational expert.

The ALJ issued a written decision denying benefits on August 31, 2012, making the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.

2.    The claimant has not engaged in substantial gainful activity since December 28, 2009, the alleged onset date.

3.    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; status post lumbar spine fusion with subsequent hardware removal and obesity.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity ("RFC") to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant can lift/carry up to 10 pounds maximum; sit a total of about six hours in an eight-hour workday and stand/walk a total of about two hours in an eight-hour workday. She can occasionally climb ramps and stairs, balance, stoop, kneel and crouch, but never climb ladders, ropes or scaffolds or crawl. She requires a cane to ambulate and can use her non-cane hand for carrying objects. She cannot repetitively use her right upper extremity, meaning using it more than three times in a row. She can occasionally push with her left lower extremity and would need to stand for five minutes after every 30 minutes of sitting/walking. She must avoid wet, slippery, uneven surfaces as well as unprotected heights and hazardous machinery. A bathroom must be readily accessible to her. She is limited to simple, repetitive and routine tasks due to symptoms of pain.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born [in 1971] and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.    The claimant has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 28, 2009, through the date of this decision.

(AR 24-35).

On October 25, 2013, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. On December 20, 2013, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see*

*also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically

considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## FACTUAL BACKGROUND

Plaintiff had a lumbar laminectomy at L4-5 on March 20, 2007. On July 15, 2007, Dr. Gorup noted that she had reached maximum medical improvement with a partial permanent impairment ("PPI") rating of 5% due to chronic pain and denervation of the nerve root.

Subsequently, during her employment as a certified nursing assistant ("CNA"), Plaintiff was in a car accident on December 28, 2009. She was evaluated in the emergency room, given pain medication, and discharged. On December 30, 2009, she followed up with Carl Griffin, M.D., complaining of left hip and thigh pain and right ankle pain. Dr. Griffin diagnosed sacroiliac region sprain and strain and ankle sprain and strain and recommended physical therapy. Plaintiff treated

with Dr. Griffin for her back, left hip, and left lower extremity pain and attended physical therapy. She also saw Ryan Loyd, D.O., for pain management during this period of time.

On May 7, 2010, a lumbar MRI revealed mild left lumbar scoliosis at L4, bulging that produced mild right lateral stenosis, bulging at L5-S1 with mild left lateral stenosis, and ligament hypertrophy producing mild central stenosis at L3-4. On June 8, 2010, Dr. Griffin indicated that Plaintiff's complaints of low back, left hip, and left lower extremity symptoms had been managed with work limitations, NSAIDs, narcotics, therapy, pain management, and epidural steroid injections but that she continued to complain of daily pain which interfered with her abilities to sit, stand, walk, or run. He assessed her with a whole person impairment of 2%.

In August 2010, Plaintiff was referred for an independent medical evaluation by the Workers' Compensation Board in connection with her December 2009 car accident. John Shay, M.D., evaluated Plaintiff. Dr. Shay opined that Plaintiff's diagnosis was chronic lumbar syndrome, which he categorized as fair, recommending further treatment before Plaintiff returned to work.

On October 25, 2010, Plaintiff returned to Dr. Loyd, complaining of left buttock and thigh pain and a new right elbow pain. Dr. Loyd could not correlate Plaintiff's left buttock and thigh pain to the recent MRI. The same date, Plaintiff returned to treatment with Dr. Gorup, who assessed spondylolisthesis, lumbar canal stenosis, and lumbar radiculopathy and recommended that Plaintiff undergo a fusion surgery. On February 3, 2011, Plaintiff underwent a fusion at L4-5 with rod placement and a revision of her previous decompressive laminectomy. Dr. Gorup saw Plaintiff for follow-up appointments in February, April, and May 2011. Plaintiff began physical therapy in February 2011 and was discharged from physical therapy in July 2011, having attended 44 sessions.

Plaintiff continued to treat with Dr. Gorup in July 2011. In August 2011, she was treated by orthopedist Michael Highhouse, M.D. for hip pain. During a followup on September 26, 2011, Dr. Highhouse reviewed the MRI and noted there was no clear cause for the claimant's hip pain. Dr. Highhouse gave Plaintiff an injection into her hip and released her from his care. In October 2011, Dr. Gorup recommended an injection for pain at the site of Plaintiff's hardware. On November 16, 2011, Plaintiff received the injection, which was successful. Subsequently, at Dr. Gorup's recommendation, Plaintiff's hardware was removed on December 6, 2011. On December 20, 2011, Dr. Gorup followed-up with Plaintiff and noted she was "doing well without complaints." Dr. Gorup kept Plaintiff off work and started her on physical therapy. In January 2012, Plaintiff complained of some ongoing leg pain to Dr. Gorup, who directed her to resume therapy.

On March 20, 2012, Plaintiff continued to complain of leg pain, and Dr. Gorup suspected chronic de-enervation of the nerve root. He indicated that Plaintiff was at maximum medical improvement and discharged her from his care, assigning a PPI rating of 8% of the whole person and referring her to pain management to discuss further nonsurgical treatment options. In May 2012, Plaintiff returned to Dr. Ramos for pain management. On June 8, 2012, Plaintiff received a lumbar epidural steroid injection by Dr. Ramos.

On July 19, 2012, Dr. Julian Ungar-Sargon, M.D., Ph.D. examined Plaintiff to provide a medical source statement, which he issued on August 5, 2012.

## ANALYSIS

Plaintiff seeks reversal and remand for further proceedings, arguing that the ALJ (1) improperly discredited Plaintiff based on a purported delay in treatment; (2) improperly evaluated and weighed the opinion of Dr. Ungar-Sargon; (3) improperly relied on the 8% PPI rating given by

8

Dr. Gorup in March 2012; (4) failed to consider the number of days Plaintiff would miss work as a result of her medical appointments; (5) improperly found her depression to be not severe; (6) improperly analyzed the sit/stand option and Plaintiff's use of her cane; and (7) improperly rejected the opinion of the independent vocational expert. The Court considers each in turn.

## A. Credibility

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the symptoms affect her daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a); 416.929(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)  The individual's daily activities;
(2)  Location, duration, frequency, and intensity of pain or other symptoms;
(3)  Precipitating and aggravating factors;
(4)  Type, dosage, effectiveness, and side effects of any medication;
(5)  Treatment, other than medication, for relief of pain or other symptoms;
(6)  Other measures taken to relieve pain or other symptoms;
(7)  Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3). "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367 (citing *Terry*, 580 F.3d at 477); SSR 96-7p, 1996 WL 374186, at *2 (Jul. 2, 1996) ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

Plaintiff argues that the ALJ erred by discrediting her for not having surgery "until February 2011." (Pl. Br. 7 (quoting (AR 31))). Plaintiff argues that the ALJ failed to acknowledge that Plaintiff had been working with worker's compensation because she had been injured at work and she had no other means to pay for her treatment. Plaintiff contends that she did not avoid other forms of treatment prior to that date. She explains that she hired a lawyer to help restart her worker's compensation benefits, which had been stopped. Following the August 26, 2010 independent medical examination, Plaintiff returned to treatment because Dr. Shay opined that she had not reached maximum medical improvement. (AR 325-27). It was not until October 2010 that Dr. Gorup opined that non-surgical treatment was not going to provide Plaintiff with any further benefit and recommended surgery. Thus, Plaintiff argues that her "delayed" treatment is actually a sign of her perseverance to continue to seek treatment and should bolster her credibility.

Indeed, Plaintiff's persistence in pursuing treatment until she eventually received the surgery does not constitute a needless delay and bolsters her credibility. However, there is no indication in the decision that the ALJ discredited Plaintiff based on the date of her surgery. In fact, the ALJ accounted for many of Plaintiff's complaints prior to the February 2011 surgery. For example, the ALJ considered Plaintiff's complaints of left-sided pain, as well as examination findings of lumbar tenderness and positive straight leg raising at times. Nevertheless, the ALJ should not have implied fault on Plaintiff's part with the wording "[i]t was not until February 2011 when [Plaintiff] heeded to Dr. Gorup's recommendation to undergo" surgery. (AR 31). To the extent the ALJ may have impliedly discredited Plaintiff on this basis, the ALJ erred.

But remand is not required because the remainder of the credibility determination is supported by substantial evidence and is unchallenged by Plaintiff. The ALJ considered inconsistencies in Plaintiff's statements regarding the level of pain she was experiencing, the largely normal examination findings, Plaintiff's treatment, and the medical opinions. Moreover, the ALJ credited several aspects of Plaintiff's testimony that were supported by the record and adjusted the RFC accordingly to limit Plaintiff to less than the full range of sedentary work with only occasional pushing and pulling with the lower extremities. (AR 30). The ALJ further accommodated Plaintiff's complaints of concentration problems due to her pain by limiting her to simple, repetitive, routine tasks. He further included the limitation of using a cane when ambulating to address her antalgic gait. The credibility determination is not patently wrong.

## B. Weight to the Opinion of Dr. Ungar-Sargon

An ALJ is required to evaluate every medical opinion received, regardless of its source. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Factors the ALJ considers in weighing medical opinion evidence include the examining relationship, the treatment relationship, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors brought to the ALJ's attention. *Id.* §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). Under what is known as the "treating physician rule," the opinion of a treating physician on the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).

Plaintiff criticizes the ALJ for improperly evaluating and weighing the opinion of Dr. Ungar-Sargon, who saw Plaintiff for the purpose of providing a medical source statement. Dr. Ungar-Sargon examined Plaintiff in his office on July 19, 2012, and issued a report on August 2, 2012. Dr. Ungar-Sargon noted that Plaintiff had pain and stiffness in the morning that worsened as the day went on. He found her "clearly depressed and in pain," noting that she complained of pain that radiated down her left side, buttock, and into her knee and ankle. Plaintiff's straight leg raise test was positive, and she had a mild limp. Dr. Ungar-Sargon completed a residual functional capacity evaluation, opining that Plaintiff could rarely lift up to 10 pounds, could sit for up to two hours in an eight-hour workday, could walk for one hour in an eight-hour workday, and could stand for 30 minutes in an eight-hour workday. He further opined that Plaintiff required the use of a cane when ambulating. He opined that she could rarely reach; frequently handle, finger, and feel; but never push/pull; and that she could rarely operate foot controls or climb ramps or stairs. Dr. Ungar-Sargon opined that Plaintiff should never climb ladders, ropes, or scaffolds; balance; stoop; kneel; crouch; or crawl. Finally, he imposed environmental restrictions of never being around unprotected heights or moving machinery and rarely being around humidity/wetness, extreme cold, or vibrations.

After reciting these limitations, the ALJ agreed with the environmental restrictions, the need to ambulate with a cane, and the sit/stand option. However, in giving the remainder of the opinion little weight, the ALJ noted that Dr. Ungar-Sargon examined Plaintiff on only one occasion in addition to having reviewed her medical records. In contrast, the ALJ noted that Plaintiff's long-term treating doctor, Dr. Gorup, indicated that Plaintiff was only 8% disabled or was at least able to lift up to ten pounds. The ALJ further noted that Plaintiff's physical examinations "tend to result in

some tenderness in her lumbar spine with occasional positive straight leg raising and an antalgic gait, but overall, the results are normal to very mild." (AR 34).

First, Plaintiff faults the ALJ for noting that Dr. Ungar-Sargon saw Plaintiff only one time in July 2012. Although Plaintiff is correct that Dr. Ungar-Sargon examined Plaintiff a second time on August 30, 2012, at the time he gave his medical source statement on August 5, 2012, Dr. Ungar-Sargon had only seen her once. The ALJ did not err in pointing this out.

Plaintiff also faults the ALJ for failing to note that, in objective testing performed on August 2, 2012, Dr. Ungar-Sargon documented peroneal neuropathy, left L4-5 radiculopathy, cervical radiculopathy, osteoarthritis in the SI joints and hips, and continued degeneration in the lumbar spine. Plaintiff contends that these findings do not support the ALJ's label of "normal to very mild" results and that the ALJ's failure to address the objective findings render the decision unsupported. (AR 34). Plaintiff argues that this is an example of the ALJ playing doctor and substituting his viewpoint for that of Dr. Ungar-Sargon. (Pl. Br. 8). Plaintiff notes that the vocational expert testified that there would be no available work with Dr. Ungar-Sargon's restrictions.

Plaintiff incorrectly identifies Dr. Ungar-Sargon as a treating physician in making this argument. Moreover, the ALJ considered the proper factors in weighing Dr. Ungar-Sargon's opinion, including the frequency of the relationship and the inconsistencies with other evidence of record from the treating physician. Other than the objective testing performed by Dr. Ungar-Sargon, Plaintiff does not dispute the ALJ's finding that the results of the physical examinations were generally normal to very mild nor does Plaintiff point to contrary evidence in her ongoing treatment records.

As for the objective findings from the testing performed by Dr. Ungar-Sargon on August 2, 2012, and Dr. Ungar-Sargon's August 30, 2012 examination notes, that evidence was not in the record before the ALJ. Rather, it was submitted to the Appeals Council after the ALJ's decision. Therefore, the ALJ did not err by not including the test results or Dr. Ungar-Sargon's second examination in his analysis.

Nor is remand under sentence six of 42 U.S.C. § 405(g) for consideration of these records proper in this case. To be added to the administrative record on appeal, evidence must qualify as both "new" and "material." 42 U.S.C. § 405(g); *Rice v. Barnhart*, 384 F.3d 363, 366 n. 2 (7th Cir. 2004). "'[N]ew' means evidence 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (quoting *Sample v. Shalala*, 999 F.2d 1138, 144 (7th Cir. 1993) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990))). *In Farrell v. Astrue*, the court explained that the evidence the plaintiff "wanted the court to consider was not 'new' to the district court because it had already been submitted to, and rejected by, the Appeals Council" and held that "evidence that has been rejected by the Appeals Council cannot be considered to reevaluate the ALJ's factual findings." 692 F.3d 767, 770-71 (7th Cir. 2012).

The Seventh Circuit Court of Appeals has also held that additional information submitted to the Appeals Council is not "new" when it existed prior to the ALJ's decision but simply had not been submitted in a timely fashion. *See Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005). Both the objective test results dated August 2, 2012, as well as the second treatment note from Dr. Ungar-Sargon dated August 30, 2012, existed prior to the ALJ's August 31, 2012 decision but were not submitted until the review by the Appeals Council. *See* (AR 5) ("AC Exhibits List"). Plaintiff has

not offered any explanation as to why these records that existed prior to the ALJ's decision were not submitted to the ALJ. *See Perkins*, 107 F.3d at 1296 ("Perkins has not shown good cause for his failure to seek out and include Dr. Reich's evaluation into the earlier record.").

Thus, the records are not "new" for purposes of sentence six and remand is not proper. Notably, Plaintiff's brief focuses solely on whether the ALJ erred by not reviewing the evidence without acknowledging that evidence was not before the ALJ; Plaintiff does not ask for remand under sentence six in her opening brief, does not cite the applicable standard, and, thus, does not attempt to meet the standard.

In the interests of thoroughness, the Court notes that Plaintiff does not ask the Court to review the Appeals Council's decision and makes no argument criticizing the Appeals Council's rejection of her appeal. *See Farrell*, 692 F.3d at 771 (recognizing that "whether the ALJ's decision is supported by substantial evidence is not the same question as whether the Appeals Council properly rejected [the claimant's] appeal," analyzing the same language used by the Appeals Council in this case). Nevertheless, the Court finds that, even if Plaintiff had challenged the Appeals Council's decision, this evidence, which is "new" for the Appeals Council's purpose because it was new to the administrative record at the time of the appeal, is not "material." *See id.*

New evidence is "material" if it relates to the period on or before the date of the ALJ hearing and there is a "*reasonable probability* that the ALJ would have reached a different conclusion had the evidence been considered." *Perkins*, 107 F.3d at 1296 (emphasis added); *see also Schmidt*, 395 F.3d at 742; 20 C.F.R. § 404.970(b). Plaintiff has not identified any portion of the August 30, 2012 treatment note showing a significant change in Plaintiff's condition from what Dr. Ungar-Sargon reported in the July 19, 2012 treatment notes or the August 5, 2012 medical source statement. *See*

(AR 960-61). It is not clear whether Dr. Ungar-Sargon incorporated the results of the August 2, 2012 objective testing in his August 5, 2012 medical source statement, which the ALJ reviewed. Nevertheless, like the August 30, 2012 treatment notes, Plaintiff has not attempted to show how the objective test results showing peroneal neuropathy, left L4-5 radiculopathy, cervical radiculopathy, osteoarthritis in the SI joints and hips, and continued degeneration in the lumbar spine are significantly different from prior test results or would change the ALJ's consideration of the evidence of record. The ALJ already accounted for the severity of Plaintiff's pain and limitations related to her back and lower extremities, as discussed above. *See Barker v. Colvin*, No. 12-CV-29, 2013 WL 4481287, at *14 (N.D. Ind. Aug. 19, 2013) ("It is not evident how this additional evidence was material. Although these new observations and surgery support [plaintiff's] complaints of pain, the ALJ already had accommodated [plaintiff's] knee pain by restricting him to a sedentary position."). Based on the record, there is not a reasonable probability that the ALJ would have reached a different conclusion. Remand is not required.

### C. PPI Rating

On March 20, 2012, Dr. Gorup, Plaintiff's treating physician, found that Plaintiff had an 8% PPI rating of the whole person. (AR 954). Dr. Gorup noted that Plaintiff continued to complain of ongoing leg pain, which Dr. Gorup suspected was representative of chronic denervation of the nerve root. He noted that her wound from the hardware removal surgery was well healed and neurologically, she was intact. On that date, Dr. Gorup discharged Plaintiff from his care at maximum medical improvement. However, he also referred her to pain management to discuss further nonsurgical treatment options. Indiana Worker's Compensation was copied on the letter. A PPI rating is permanent partial impairment rating, which is "a medical doctor's determination of

some permanent loss of function of a body part(s) as a result of an employee's work accident. The rating does not take into account your ability to do you old job again." http://www.workerscompindiana.com/tag/ppi-rating-workers-comp/ (last visited Feb. 5, 2015).

Plaintiff argues that the ALJ misused the evidence of the 8% PPI rating because the rating does not mean that Plaintiff was only 8% disabled but rather than she was entitled to an 8% PPI payment in the worker's compensation system. She abandons this argument in her reply brief.

In reviewing the medical records, the ALJ noted that Plaintiff had her hardware removed in December 2011 and that subsequently, Dr. Gorup suspected chronic denervation of the nerve root and kept Plaintiff off work as a CNA. The ALJ further noted, however, that Dr. Gorup assigned Plaintiff with an 8% PPI rating, which the ALJ found "not consistent with a total disability finding." (AR 32). Also, on the context of weighing Dr. Ungar-Sargon's opinion, the ALJ noted that Plaintiff's "long-term treating doctor, Dr. Gorup, indicated the claimant was only 8% disabled or at least able to lift up to 10 pounds." (AR 34). Despite his use of the phrase "8% disabled," when the ALJ's decision is read as a whole, including his restrictive RFC limiting her to a range of sedentary work, the ALJ reasonably considered, as one fact, that the 8% PPI was not consistent with a finding of complete disability; the ALJ did not make a finding that Plaintiff was only 8% disabled.

### D. Continuity of Work

Plaintiff contends that the ALJ failed to consider the number of days of work Plaintiff would miss as a result of her medical appointments. In support, she cites a spreadsheet she created showing the number of medical and physical therapy appointments per month from January 2010 through October 2012. She also references the vocational expert's testimony that if she were off task 20% of the work day or missed two days of work a month, there would be no jobs. She argues that her

pursuit of treatment to improve her condition would affect her ability to sustain employment due to the number of days of work she would miss.

First, like the more recent records of Dr. Ungar-Sargon, the attorney-created spreadsheet was not before the ALJ. It was presented for the first time to the Appeals Council, and, thus, is not before the Court for substantial evidence review. Regardless, the records that were considered by the ALJ constituted evidence regarding the frequency of Plaintiff's medical care during the relevant period. And, Plaintiff's argument is unavailing. She has not identified any evidence in the medical record that attendance at her appointments would, in fact, require her to miss an entire day of work. Many of the appointments she cited were physical therapy appointments, which lasted less than an hour. *See* (AR 662, 665, 668-69, 671-78). It is also possible that these and other medical appointments could have been and would be able to be scheduled around a work schedule, such as on the weekends, during the lunch hour, or before or after work.

In her reply brief, Plaintiff cites Dr. Ungar-Sargon's notation that Plaintiff reported that she has three good days and four bad days a week. (AR 967). However, this is one notation in an administrative record of over 1,000 pages. The ALJ thoroughly reviewed all the evidence of record in his RFC determination. Plaintiff has not made a showing that her medical appointments would cause her to miss work to the extent that she would not be employable. *See Hoppa v. Colvin*, No. 12-CV-847, 2013 WL 5874639, at *5 (W.D. Wis. Oct. 31, 2013) (finding that the plaintiff had not made a showing through the medical evidence that her impairments required so many medical appointments that she would be unable to obtain a full time job, reasoning, in part, that "[i]f the 'sheer number of medical visits' were sufficient on its own, claimants could manufacture their own

disabilities simply by going to the doctor as often as possible"). The ALJ did not err by not finding that Plaintiff would miss two or more days of work per month.

### E. Mental Impairment

Plaintiff argues that substantial evidence does not support the ALJ's conclusion that her depression was not a severe impairment because the evidence does not support the conclusion that she only has mild limitations in concentration, persistence, and pace. (AR 27). Plaintiff notes that at the mental status examination performed by John T. Heroldt, Ed.D. on April 13, 2011, Dr. Heroldt noted that Plaintiff's memory was below average, she had difficulty with simple calculations, and she could not complete serial 7s or 3s. Dr. Heroldt also assigned her a GAF of 50. Plaintiff criticizes the ALJ for focusing on the GAF without addressing how the doctor's poor memory findings contradict the RFC for no limitations in concentration, persistence, or pace.

First, the ALJ explicitly discussed Dr. Heroldt's report and evaluation and discussed his examination finding that indicated below average memory. (AR 26). The ALJ relied on the fact that Dr. Heroldt did not assess Plaintiff with any particular limitations other than being unable to manage her own funds.

Moreover, Plaintiff offers no discussion of the opinions of the state agency psychological consultants on whom the ALJ relied. The ALJ gave great weight to the opinions of Randal Horton, Psy.D. and Amy Johnson, Ph.D., which Plaintiff does not acknowledge or challenge. In December 2010, prior to the April 2011 mental status evaluation, Dr. Horton reviewed the record evidence before him and opined that Plaintiff had no medically determinable mental impairments. In June 2011, after the April 2011 mental status evaluation, Dr. Johnson considered Plaintiff's depression, the opinion of Dr. Heroldt, Plaintiff's allegations, and Plaintiff's medical history but opined that

Plaintiff did not have a severe impairment, finding that Plaintiff had only mild difficulties in maintaining concentration, persistence, or pace. (AR 460-72). Plaintiff does not challenge Dr. Johnson's findings, and the ALJ was justified in relying on the report of the state agency consultant. *Schmidt*, 395 F.3d at 745.

The ALJ did not err in finding that Plaintiff does not have a severe mental impairment.

### F. Sit/stand Option and Use of Cane

In her opening brief, Plaintiff argues that the ALJ's analysis of the sit-stand option was not supported by substantial evidence because the vocational expert did not testify as to how he arrived at the reduced number of available jobs with a sit/stand option and because the vocational expert testified that, if Plaintiff needed her cane to stand, all jobs would be eliminated. Plaintiff abandons this argument in her reply brief.

First, the portion of the vocational expert's testimony cited by Plaintiff regarding the reduced number of jobs, (Pl. Br. 10 (citing AR 84)), was given in response to a hypothetical question involving a sit/stand option every fifteen minutes. This is not the testimony on which the ALJ relied for his step five finding. Rather, the ALJ relied on the response to a hypothetical question that included a limitation to standing for five minutes after every thirty minutes of sitting/walking. Regardless, the vocational expert testified that, although the DOT did not address sit/stand options, he was able to identify jobs based on his professional experience. Plaintiff does not challenge this testimony or the vocational expert's professional qualifications.

Second, Plaintiff does not identify any evidence in the record that she requires her cane to stand. The evidence of record supports the ALJ's finding that Plaintiff requires her cane for ambulation. Plaintiff testified that she uses a cane to walk, (AR 261), and consultative examiner Dr.

Ibrar Paracha noted on November 20, 2010, that Plaintiff was not using an assistive device at that time but that she likely would benefit from one as it would improve her mobility. The ALJ did not err in his analysis of the sit/stand option.

## G. Independent Vocational Expert

Finally, Plaintiff argues that the ALJ improperly rejected the opinion of the independent vocational rehabilitation specialist, Michael L. Blankenship. On May 29, 2012, Mr. Blankenship interviewed Plaintiff, reviewed her medical records, and evaluated her vocational and educational history and then issued a written report on May 31, 2012. Mr. Blankenship opined, "I am unaware of any reasonable type of employment for which she would be capable, qualified, and able to sustain herself during the traditional eight hour work day." (AR 860). He further opined that the ability to perform employment at the sedentary level "is not supported by the manner in which [Plaintiff] presents herself while sitting." *Id*.

While the ALJ considered Mr. Blankenship's opinion, he found inconsistent Mr. Blankenship's opinion that Plaintiff's reliance upon an assistive device would preempt her from most every type of employment and the vocational expert's testimony at the hearing identifying a significant number of jobs available to an individual limited to sedentary work who relies on a cane to ambulate. The ALJ also discounted Mr. Blankenship's opinion that Plaintiff could not perform sedentary work because she was shifting in her chair during the interview because Plaintiff's "treating physicians" did not limit her completely from working. (AR 33). The ALJ also noted that the finding of disability is reserved for the Commissioner.

Plaintiff criticizes the ALJ's reasoning because Dr. Ungar-Sargon "*implied* that she would not be able to sustain competitive work." (Pl. Br. 11 (citing (AR 967-68))) (emphasis added).

Plaintiff also argues that Dr. Gorup reported to worker's compensation that she would be unable to work. *Id.* (citing (AR 727)). First, Dr. Ungar-Sargon was not a treating doctor, and the Court has already found that the ALJ properly gave his opinion less weight. Second, the page of the record cited by Plaintiff is not an opinion of Dr. Gorup but rather a statement by Plaintiff's *attorney* to the worker's compensation board that "Dr. Gorup stated that she is unable to work." (RA 727). Dr. Gorup's March 21, 2012 letter discharging her from his care found a PPI rating of 8% for purposes of the worker's compensation claim. As discussed above, the ALJ properly found that this was not a finding of complete disability. The Court finds that the ALJ properly considered several factors in discounting Mr. Blankenship's opinion.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the relief sought in the Memorandum in Support of Disability [DE 18]. The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, and against Plaintiff Melissa K. Fieleke.

So ORDERED this 9th day of February, 2015.

s/ Paul R. Cherry_____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record